# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DISTRICT

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 12 CR 50 |
| | ) | |
| v. | ) | Judge Joan H. Lefkow |
| | ) | |
| ROBERT JEFFERSON, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Robert Jefferson was convicted of aiding in the commission of robbery of a person with lawful charge, control, and custody of United States money, and in doing so putting the life of said person in jeopardy by the use of a dangerous weapon in violation of 18 U.S.C. §§ 2114(a) and 2. Before the court is Jefferson's motion for acquittal. For the reasons stated below, Jefferson's motion is denied.

## BACKGROUND

Jefferson was charged in a second superseding indictment along with Michael Parrish on October 31, 2012. (Dkt. 55.) As it relates to Jefferson, the indictment charged (1) Jefferson and Parrish with robbery of a person in lawful custody of United States property, in violation of 18 U.S.C. §§ 2114(a) and 2 (Count I); (2) Jefferson and Parrish with using, carrying, and brandishing a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c) and 2 (Count II); and (3) Jefferson with attempted distribution of heroin, in violation of 21 U.S.C. § 846 (Count V). (*Id.*) The charges against Jefferson arose from the January 19, 2012 armed robbery of undercover Bureau of Alcohol, Tobacco, and Firearms ("ATF") Special Agent Christopher Labno. (Dkt. 117 at 1.) Labno was robbed while in possession of $2,500 of

United States cash he intended to use to purchase 25 grams of heroin from Jefferson. (*Id*.) After a trial in July 2013, the jury found Jefferson guilty of Counts I and V but were unable to reach a verdict as to Count II. (Dkt. 108.)

The government's theory at trial was that Jefferson had a "Plan A" and a "Plan B" on January 19, 2012. Plan A was to obtain heroin from a drug dealer, Mario Bonds, to sell to Labno. (Tr. at 523:15-17.) But when Bonds was unable to deliver the 25 grams of heroin that Jefferson had requested, Jefferson moved on to Plan B: rob Labno of the money he had brought with him to purchase the heroin. (*Id.* at 523:17-524:1.)

The government brought the three above-mentioned counts against Jefferson, proceeding on an aiding and abetting theory against him for Counts I and II. (Dkt. 117 at 3.) The government had six witnesses at trial testify to the following facts that are relevant to the pending motion.

The government's first witness was Labno. He explained that on the day of the robbery, he was posing as an out-of-town drug dealer who had come to Chicago to purchase $2,500 of heroin. (Tr. at 196:15-197:13.) A confidential informant set up the transaction between Labno and Jefferson and was present for the duration of it. (*Id*. at 194:10-16.) Labno arrived at the corner of Arthington Street and Independence Boulevard on the west side of the city around 11:40 a.m. on January 19, 2012, and Jefferson and the confidential informant arrived about 10 minutes later. (*Id.* at 220:6-221:23.) For the next 40 or so minutes, Jefferson was in and out of Labno's car as he attempted to contact and waited for his heroin dealer. (*See, e.g., id.* at 224:11-23.) Jefferson asked Labno to show Jefferson the money for the drug transaction, which Labno

2

testified concerned him because "asking to see the money without . . . delivering the product[ ] can be an indicator of a robbery." (*Id.* at 228:3-16.)

At approximately 12:14 p.m., Jefferson exited Labno's car to meet with Bonds and then reentered the car. (*Id.* at 233:9-236:5.) Jefferson explained to Labno that Bonds, Jefferson's heroin dealer, had brought some but not all of the heroin Labno wanted and that Bonds had gone to obtain more. (*Id.* at 236:25-238:11.) At approximately 12:25 p.m., Labno noticed Parrish walk by his car as Parrish walked eastward on Arthington. (*Id.* at 240:17-242:25.) Labno testified that he noticed Parrish walk by the car because Parrish "came very close to my car and kind of looked in purposeful way [*sic*] that he kind of slowed down and looked in and then kept going." (*Id.* at 243:3-6.) When Parrish walked by, Jefferson was standing outside of Labno's car but Parrish "just walked right on by" without stopping to speak with Jefferson. (*Id.* at 243:7-18.) Labno then noticed a minivan traveling in the same direction as Parrish whose driver looked into Labno's car as the minivan passed by. (*Id.* at 244:1-16.) Labno later identified the driver of the minivan as Ronald Witcher. (*Id.* at 244:20-23.)

Labno testified that his undercover car was a two-door vehicle that had automatic door lock buttons on both the driver's and passenger's door. (*Id.* at 250:1-23.) Labno kept the driver's side door locked for protection, but when Jefferson re-entered the car, Labno observed Jefferson pressing the automatic unlock button to unlock both doors. (*Id.* at 251:2-12.) At approximately 12:35 p.m., Labno observed Jefferson sending a text message on his cellular telephone. (*Id.* at 251:21-252:6.) It was revealed later at trial that this was a text message to Parrish that read, "Man, just do you, I'm in here with him." (*Id.* at 423:22-24.) After sending the text message, Jefferson engaged in what Labno testified was a fake telephone call: Jefferson

3

"appeared to be placing a call, but it wasn't actually really going through. He really wasn't placing the call, he just appeared to be going through the motions. . . He was taking the phone, taking a look at it, pressing some buttons, holding it up to his ear, sometimes not speaking, and then bringing it down." (*Id.* at 251:21-252:23.) Labno testified that Jefferson was "getting more and more nervous" and was looking in the rear view mirror. (*Id.* at 253:2-11.)

Labno then noticed Parrish walking towards the driver's side of the car and, as he approached, Labno saw that he was holding a loaded silver revolver. (*Id.* at 253:17-254:18.) Parrish opened the driver's side door, pointed the revolver at Labno's head, and demanded Labno's money, saying that if Labno moved Parrish would "pop the shit out of you." (*Id.* at 254:19-255:6.) Labno threw the $2,500 he had onto the street and then put his hands in the air. (*Id.* at 256:6-257:10.) Parrish scooped up the money and began jogging west, the same direction from which he had come. (*Id*. at 257:13-19.)

Labno testified that as all of this was happening, Jefferson was seated in the passenger's seat of Labno's car. (*Id.* at 258:12-14.) Labno stated that when Parrish approached the car Jefferson said, "oh, shit" and then exited the car and began jogging towards the back of the car, in the same direction as Parrish ran after Parrish had picked up the money. (*Id.* at 258:19-259:7.) Labno exited the car and saw Parrish and Jefferson on the sidewalk on the south side of Arthington, where Parrish was "reaching out to Mr. Jefferson who was reaching out to take money from his hand" but Jefferson was not able to take hold of the money. (*Id.* at 259:12-24.) When Parrish turned to pass the money to Jefferson, Parrish saw that Labno had exited the vehicle and pointed his gun at Labno. (*Id.* at 260:6-11.) When Labno saw Parrish do this he fired twice at Parrish but did not hit either Jefferson or Parrish. (*Id.* at 260:12-20.) Jefferson and

4

Parrish continued to run westbound on Arthington before they turned around a building and Labno lost sight of them. (*Id.* at 260:21-24.)

The government's next witness was Rene Marano, a special agent with the ATF. Marano and another ATF special agent, Eric Dornbusch, were "react agents" for the Labno transaction, assigned to be the first people on the scene if Labno or the confidential informant were to signal distress. (*Id.* at 301:1-8.) Marano and Dornbusch were in a car parked on Independence just south of the Independence/Arthington intersection. (*Id.* at 302:2-6.) At approximately 12:42 p.m., Marano saw Witcher and Parrish exit a minivan at Arthington and Independence and then lost sight of them. (*Id.* at 310:1-313:2.) The next thing Marano saw was Witcher walking back to the minivan, and then, seconds later, Marano heard Labno's distress signal. (*Id.* at 313:3-16.) When he heard the signal he pulled his car up about three car lengths on Independence toward Arthington and then stopped "because I observed Mr. Witcher and Parrish running side by side toward—southbound on the east side curb." (*Id.* at 313:20-314:10.) Marano and Dornbush both exited their car and Dornbusch aimed the weapon he was carrying at Witcher and Parrish, telling them to stop. (*Id.* at 314:19-315:17.) Marano saw Witcher stop and drop to his knees, and he saw Parrish throw money and what appeared to be a gun onto the grass next to the sidewalk and continue running southbound on Independence. (*Id.* at 315:19-316:20.) Marano ran after Parrish as Parrish turned eastward into an alley and then northward into another alley before Parrish lost his footing and Marano was able to tackle him and place him in custody. (*Id.* at 316:21-317:21.)

The government's next witness, Dornbusch, testified consistently with Marano. He stated that he and Marano were in their vehicle when they heard the distress signal and then

Dornbusch saw "Ronald Witcher and Michael Parrish [ ] running side by side . . . on the sidewalk here running in the southbound direction." (*Id.* at 360:3-11.) When Dornbusch yelled at Witcher and Parrish to stop, Witcher immediately complied, lying down on the ground, but Parrish "threw a shiny chrome object at me and another bundled piece of paper object at me, and then immediately ran southbound on the sidewalk of South Independence Boulevard." (*Id.* at 360:12-361:14.)

The government then put on another ATF agent, Adam Delgado, who was also participating in surveillance of the Labno transaction. He was stationed on the north side of Arthington facing west, approximately 200 feet from Labno's car. (*Id.* at 378:10-22.) Delgado corroborated Labno's testimony about Witcher driving by Labno's car in the minivan at approximately 12:26 p.m. and Parrish passing by on foot. (*Id.* at 380:7-382:25.) Then, around 12:44 p.m., Delgado saw Parrish and Witcher walk northbound on Independence and then turn onto Arthington toward Labno's car. (*Id.* at 384:1-385:6.) Witcher stopped and stood looking southbound on Independence while Parrish walked up to the driver's door of Labno's car. (*Id.* at 385:1-6.) Delgado testified that he saw the door open and Parrish stood there for approximately three to five seconds, and then he turned and ran from the car "back to the path that he and Mr. Witcher had previously taken to get to that point. Mr. Witcher had a head start on him, but they were both running . . . [s]outhbound on Independence." (*Id.* at 385:13-22.) The next thing Delgado saw was Labno exiting his car, "point[ing] his weapon in the direction that they were fleeing, that Mr. Parrish and Mr. Witcher were fleeing, and he discharged his weapon twice." (*Id.* at 385:23-386:3.) Delgado proceeded to drive to Labno to ensure he was okay and, as he was driving up, he did not see anyone running eastbound on Arthington in his direction.

(*Id.* at 368:6-12.) Delgado testified that, from his vantage point, he did not notice anyone else exiting Labno's car. (*Id.* at 386:13-17.)

The government's next witness was ATF agent Joseph Delucio, whose role during the January 19 transaction was to handle the confidential informant and participate in surveillance. He was positioned on Independence about a block north of Arthington and could not see Labno's car prior to learning of the distress signal. (*Id.* at 407:15-408:6.) He testified that after Parrish was arrested, no drugs were found on his person. (*Id.* at 419:6-11.) Delucio did find a cellular telephone on Parrish that contained one text message, from Jefferson to Parrish at 12:36 on January 19, reading, "Man, just do you, I'm in here with him." (*Id.* at 420:6-425:16.) He also testified that Jefferson was arrested near the intersection of Kedzie and Fillmore closer to 5:30 or 6:00 p.m. of January 19, because agents at the scene at Arthington and Independence were unable to locate him at or near that intersection after the shots were fired. (*Id.* at 434:9-435:1.) Delucio noted that a building at the southeast corner of Arthington and Independence, 901 South Independence, has an entrance in the form of an iron gate and then a door that allows the building to be entered and exited on Arthington, but there are no buzzers and no mail slots at this entrance. (*Id.* at 435:2-436:14; 447:15-448:15.) He did not know if that door to the building was unlocked on January 19, or if any members of his team searched inside that building for Jefferson on January 19. (*Id.* at 449:18-450:4.)

The government's final witness, Kathy Cline, works for the Chicago High Intensity Drug Trafficking Area. She testified as to Jefferson's telephone records from January 18 and 19, 2012. The phone records indicated that there were five telephone calls between Parrish and Jefferson on January 18, and 15 calls between the two on January 19. (*Id.* at 460:14-461:4;

7

464:20-465:11.) The records also indicated that there were 14 calls between Jefferson and Bonds on January 19. (*Id.* at 465:12-468:22.)

At the close of the government's case, Jefferson orally moved under Federal Rule of Criminal Procedure 29 for a judgment of acquittal on Count I (*id.* at 471:1-4), and orally and in writing for a judgment of acquittal on Count II. (*Id.*; dkt. 99.) Jefferson's attorney argued to the court that there was no evidence that Jefferson helped Parrish to use the gun. (Tr. at 470:5-474:4.) The court denied the motion without prejudice and Jefferson informed the court he was prepared to rest. (*Id.* at 478:15-479:20.)

In its closing argument, the government focused on Labno's testimony and stated that Jefferson was "perfectly comfortable running alongside that armed gunman [Parrish] because the armed gunman and the defendant were in this thing together. The defendant was going with Parrish because Parrish was holding not only the gun but the money that the defendant wanted to cut." (*Id.* at 546:10-14.) The government urged the jury not to "get kind of sidetracked on this whole Witcher, Ronald Witcher issue. . . . So Parrish and Witcher were running down Independence. But those weren't the two who were running away from Special Agent Labno. The two who were jogging away from Special Agent [Labno] were Parrish and the defendant." (*Id.* at 547:15-548:8.) Jefferson's attorney argued in his closing that it was Witcher who robbed Labno with Parrish, not Jefferson, and pointed to the testimony of the ATF agents that they saw Parrish running with Witcher, not Jefferson. (*Id.* at 554:19-556:8.) Noting that mini-ziploc bags were found in Parrish's car, Jefferson's attorney argued that Parrish was another drug dealer. He explained that Jefferson was contacting Parrish on January 18 and 19 not to plan the robbery but to ask for heroin to sell to Labno, but that Parrish "burned him." (*Id.* at 559:10-561:17.)

8

The court instructed the jury that to find Jefferson guilty of Count I, it would have to find that the government proved that (1) Parrish took money of the United States from a person having lawful charge, control, and custody of such property; (2) Parrish took such property by means of force and violence or by means of intimidation; (3) Parrish put the life of a person who had lawful charge, control, and custody of the money of the United States in jeopardy by use of a dangerous weapon, and (4) Jefferson knowingly aided in the commission of the offense. (*Id*. at 595:7-19.) The court explained that "[a]ny person who knowingly aids the commission of an offense may be found guilty of that offense if he knowingly participated in the criminal activity and tried to make it succeed." (*Id.* at 596:15-18.) The court instructed the jury that to find Jefferson guilty of Count II, it would have to find that (1) Parrish committed the crime of robbery of money of the United States as charged in Count I; (2) Parrish used or carried a firearm during and in relation to such crime; (3) Jefferson knew either before or during the crime of Parrish's use or carrying of a firearm; and (4) Jefferson intentionally facilitated the use or carrying of the firearm once so informed. (*Id.* at 597:6-14.)

The jury found Jefferson guilty of Count I. It could not reach a verdict as to Count II. (*Id.* at 618:16-20) and found him guilty of Count V. (*Id.* at 618:21-22.)

Jefferson now moves for a judgment of acquittal on Count I pursuant to Federal Rule of Criminal Procedure 29(c)(2). He argues that the government did not present sufficient evidence at trial to establish that Jefferson knew that Parrish was likely going to use a dangerous weapon to rob Labno of the drug money or that Jefferson aided Parrish in using a dangerous weapon to commit the robbery. (Dkt. 115 at 3.) At most, Jefferson argues, the evidence the government presented at trial demonstrated that he learned of Parrish's use of the gun after Parrish walked up

9

to the car with the gun. (*Id.* at 3-4.) Jefferson also relies on the fact that Labno was the only government witness who testified that Jefferson ran alongside Parrish after Parrish robbed Labno. (*Id.* at 4.) Jefferson argues in his reply brief that while the government's evidence "may have been sufficient for a jury to conclude that Mr. Jefferson participated in planning the robbery, [it does] not demonstrate in any way that Mr. Jefferson was aware that a dangerous weapon was likely to be used." (Dkt. 121 at 1-2.)

The government argues that the jury's verdict was supported by the evidence because "[a] reasonable jury could have concluded that defendant's contacts with Parrish and his actions leading up to (and during) the robbery demonstrated that defendant knowingly aided Parrish in the commission of the robbery." (Dkt. 117 at 3-4.) In particular, the government points to Labno's eyewitness testimony that Jefferson (a) asked to see cash Labno brought with him to the transaction; (b) made and received multiple phone calls while with Labno, later shown to be calls to Parrish; (c) stood outside Labno's vehicle while Parrish walked by without speaking; (d) unlocked both car doors in the moments before Parrish approached the vehicle for the robbery; (e) sent Parrish a text message indicating he was with Labno just before Parrish committed the robbery; and (f) ran in the same direction as Parrish while Parrish, who was carrying the gun, attempted to hand Jefferson some of the cash he stole from Labno. (*Id.* at 4.) The government also points to other evidence it presented, such as the number of phone telephone contacts between Jefferson and Parrish on the day before and day of the robbery. (*Id.*)

## LEGAL STANDARD

Federal Rule of Criminal Procedure 29 provides, in pertinent part, that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is

insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). When requesting a judgment of acquittal under Rule 29, a defendant "faces a nearly insurmountable hurdle [because] . . . [the court] consider[s] the evidence in the light most favorable to the Government, defer[s] to the credibility determination of the jury, and overturn[s] a verdict only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *United States* v. *Blassingame*, 197 F.3d 271, 284 (7th Cir. 1999) (quoting *United States* v. *Moore*, 115 F.3d 1348, 1363 (7th Cir. 1997)); *see also United States* v. *Benjamin*, 116 F.3d 1204, 1206 (7th Cir. 1997). "In other words, [the court's] task is not to determine whether or not [it] think[s] [the defendant] was actually guilty of the [crime]; [it] must only ask whether a rational jury could have believed he was, and believed so beyond a reasonable doubt." *United States* v. *Moore*, 572 F.3d 334, 337 (7th Cir. 2009). Even evidence that is "thin at best" is "sufficient to uphold a jury's verdict" of guilty in an aiding and abetting the use of a firearms offense because the "jury's verdict will only be reversed 'if the record is devoid of evidence from which the jury could reach a finding of guilt.'" *United States* v. *Andrews*, 442 F.3d 996, 1001-02 (7th Cir. 2006) (quoting *United States* v. *Taylor*, 226 F.3d 593, 596 (7th Cir. 2000)).

## ANALYSIS

Considering the evidence in the light most favorable to the government, the court finds that it must deny Jefferson's motion. There was sufficient evidence for the jury to find that Jefferson aided and abetted Parrish's violation of 18 U.S.C. § 2114(a). "When the Government charges that a defendant aided and abetted the commission of a crime, the Government must prove the essential elements of aiding and abetting: knowledge of the crime, intent to further the

11

crime, and some act of help by the defendant." *United States* v. *Petty*, 132 F.3d 373, 377 (7th Cir. 1997) (citing *United States* v. *Draves*, 103 F.3d 1328, 1332 (7th Cir. 1997)). In the context of aiding and abetting a firearm offense, the Seventh Circuit has explained that the government must prove beyond a reasonable doubt that the defendant knew, either before or during the crime, of the principal's weapon possession or use, and the defendant intentionally facilitated the weapon possession or use once so informed. *See Andrews*, 442 F.3d at 1002 (explaining elements of 18 U.S.C. § 924(c) offense) (citing *Taylor*, 226 F.3d at 596-97); *United States* v. *Woods*, 148 F.3d 843, 846 (7th Cir. 1998) (defendant charged with armed bank robbery was required to prove not only that defendant knew bank robbery would occur but, also, that a weapon would likely be used in the crime).

**I.      Knowledge**

Jefferson argues that there was no evidence at trial establishing that he knew Parrish was likely to use a dangerous weapon to rob Labno. The Seventh Circuit has explained that the knowledge requirement may be met so long as the government introduces evidence from which the jury could conclude that the defendant knew or should have known that a firearm would be used in the crime. *Woods*, 148 F.3d at 847. In *Woods*, where the defendant suggested robbing a bank, recruited a getaway driver, obtained a getaway vehicle, and had directed an accomplice to "case" the bank before the robbery, the court determined there was enough evidence to infer that he knew that his co-bank robber would use a gun. *Id*.

The Seventh Circuit has also stated that the nature of certain crimes lend themselves to the inference that a defendant knew a firearm would be used. In *Taylor*, a carjacking case with no direct evidence that the defendant had knowledge his co-carjacker would use a gun, the

Seventh Circuit upheld a challenge to a jury's finding of guilty of aiding and abetting use of a firearm because "a reasonable jury could infer from the inherently violent character of carjackings that [the defendant] either anticipated or knew that [his co-defendant] was going to use a weapon." *Id.* Moreover, even if the defendant had not anticipated or discovered his co-defendant's planned use of the weapon before the carjacking began, the defendant continued to participate in and facilitate his co-defendant's escape even after he saw his co-defendant using the weapon on the victim. This assistance was "more than sufficient to meet the facilitation element [of aiding and abetting], which 'once knowledge on the part of the aider and abettor is established, . . . does not take much to satisfy.'" *Id.* (quoting *Woods*, 148 F.3d at 848). *See also United States* v. *Smith*, 697 F.3d 625, 635 (7th Cir. 2012) (knowledge that defendant's co-bank robber would use firearm could be inferred because it was foreseeable that firearm would be used in take-over—as opposed to note-passing—bank robbery, as robbers needed "some mechanism of obtaining control of the bank"); *but see United States* v. *Atwater*, 272 F.3d 511, 512 (7th Cir. 2001) (reversing sentencing enhancement given to bank robber where lower court improperly presumed that bank robber would have known about the use of a firearm just by nature of crime). While, as Jefferson notes, it is not always foreseeable that a firearm will be used during the commission of a crime, there was enough evidence here for the jury to conclude that Jefferson knew Parrish planned to use a firearm based on Jefferson's role in planning the robbery. The government presented evidence of the extensive contacts between Jefferson and Parrish on the day before and day of the robbery. The two spoke on the phone multiple times on January 18 and 19. Jefferson's counsel argued in his closing that these calls regarded a drug deal and not a potential robbery, but the jury was entitled to infer the latter. This

13

is especially true in light of the evidence the government presented that when Parrish walked by Labno's car while Jefferson was standing on the sidewalk, the two did not acknowledge each other. It was reasonable for the jury to infer from the suspicious nature of that contact that Parrish was not an alternate drug supplier.

The government presented other evidence indicating that Jefferson knew that the robbery was to take place. Labno testified that Jefferson asked to see the money Labno brought with him for the drug deal, which Labno said indicated that Jefferson was there to rob him. Perhaps the strongest evidence presented to the jury was the text message that Jefferson sent to Parrish just minutes before the robbery took place, and Labno's testimony that Jefferson unlocked the driver's side door. Considering Jefferson's level of participation in the planning of the robbery, a jury could have concluded that Jefferson "knew or should have known that a gun would be" used by Parrish during the robbery. *Woods*, 148 F.3d at 847.

Moreover, as in *Taylor*, the government presented evidence from which the jury could have concluded that even after Jefferson saw the gun, he continued to participate in the robbery and facilitated it by attempting to take some of the proceeds from Parrish. Jefferson distinguishes *Taylor* by arguing that the defendant there "drove with his armed codefendant while they pursued the carjacking victim in her car, was present when the codefendant shot the victim, and then aided his codefendant's flight from the scene" whereas the jury here heard no evidence that "Jefferson and Parrish were together for any considerable length of time during which Parrish was armed." (Dkt. 121 at 3.) But in *Taylor*, the Seventh Circuit noted that even if the defendant had not learned about the gun while he and his armed codefendant were in the car together, the defendant "must have so understood once [the defendant] and his cohorts trapped

14

their victim" and the armed codefendant used the gun. *Taylor*, 226 F.3d at 597. The defendant then had knowledge of the gun and proceeded to perform the requisite acts of assistance to find the defendant guilty of aiding and abetting the weapons charge because he continued to participate in the crime and facilitated his codefendant's escape. There was sufficient evidence here for the jury to believe that once Jefferson learned of Parrish's gun, he continued to facilitate the robbery, as discussed in Part II, below.

## II.     Facilitation

The Seventh Circuit has explained that "once knowledge on the part of the aider and abettor is established, it does not take much to satisfy the facilitation element." *Woods*, 148 F.3d at 848 (quoting *United States* v. *Bennett*, 75 F.3d 40, 45 (1st Cir. 1996)). A defendant who assists in the escape from a robbery after learning that the robbers have firearms with them can be found guilty of aiding and abetting armed robbery even if he did not know before that the robbers planned to use the firearms. *See Andrews*, 442 F.3d at 1002. Additionally, "an unarmed person present during a robbery makes it easier for another to carry a firearm through division of labor and that this amounts to facilitation." *Woods*, 148 F.3d at 848 (citing *United States* v. *Medina*, 32 F.3d 40, 47 (2d Cir. 1994)).

### A.     Witness credibility determinations

Jefferson argues that the government presented no evidence that he provided any help to Parrish after realizing that Parrish had a gun and that Labno's testimony about Jefferson running alongside Parrish while Parrish attempted to hand off the money was contradicted by other ATF agents. But the jury was entitled to credit the evidence the government put on in support of its theory of the case, and to take into account its assessment of the credibility of the witnesses.

"Determining the weight and credibility of witness testimony . . . has long been held to be the 'part of every case [that] belongs to the jury, who are presumed to be fitted for it by their natural intelligence and their practical knowledge of men and the ways of men.'" *United States* v. *Scheffer*, 523 U.S. 303, 313, 118 S. Ct. 1261, 140 L. Ed. 413 (1998) (quoting *Aetna Life Ins. Co.* v. *Ward*, 140 U.S. 76, 88, 11 S. Ct. 720, 35 L. Ed. 371 (1891)). So long as the jury is properly instructed as to its role in assessing witness credibility, the court may not grant a motion for a judgment of acquittal after a jury has found a defendant guilty merely because the court feels the governments' witnesses are unbelievable. *See United States* v. *Blasco*, 581 F.2d 681, 684-85 (7th Cir. 1987) (reversing judgment of acquittal because "the trial judge should not take upon himself this power of the jury" to make credibility assessments).

Labno testified that after Parrish demanded Labno's money, Parrish and Jefferson ran together westbound on Arthington while Parrish attempted to hand Jefferson money he had taken from Labno. Jefferson argues that not only did the other testifying ATF surveillance agents fail to corroborate that account, but that their testimony impeached Labno's statements that he fired his gun in the direction of Parrish and Jefferson while the two were running westbound on Arthington. Jefferson states, "The degree to which the testimony of the government's own witnesses completely contradicted Agent Labno on this point renders this portion of Agent Labno's testimony so unreliable that no reasonable jury could have relied upon it for the proposition advanced by the government." (Dkt. 121 at 2.)

It is true that Delgado's testimony is not consistent with Labno's. Delgado testified that after he saw Parrish walk up to the driver's side door of Labno's car and saw the door open, Delgado saw Parrish turn and run back in the direction he and Witcher had taken to arrive at the

16

car. He testified that "Mr. Witcher had a head start on [Parrish], but they were both running [southbound] onto the sidewalk here on Independence." (Tr. 385:5-22.) After he saw Parrish and Witcher start running, Delgado observed Labno exit his car, point his gun in the direction that Parrish and Witcher were fleeing, and discharge his weapon twice. Delgado also testified that he did not see anyone else emerge from Labno's car and did not see anyone running eastbound on Arthington. Two other ATF agents, Marano and Dornbusch, both testified that they saw Witcher and Parrish running together southbound on Independence. Another witness, Delucio, noted that there was an entrance to a building on Arthington at the southeast corner of Arthington and Independence.

The court agrees with Jefferson that Delgado's testimony contradicts Labno's, and Marano and Dornbusch's statements of what they saw on Independence seem to conflict with Labno's testimony. But the jury was entitled to weigh the testimony based on its witness credibility assessments. It is not for the court to assess the credibility of the witnesses. *Blasco*, 581 F.2d at 684-85. The court instructed the jury on how it should consider evidence and witnesses. It told the jury to give the evidence presented by the parties "whatever weight you believe it deserves" and to use its "common sense in weighing the evidence." (Tr. 589:24-590:1.) The jury also heard that it should not "make any decision simply by counting the number of witnesses who testified about a certain point," but instead that what was important was "how truthful and accurate the witnesses were and how much weight you think their testimony deserves." (*Id.* at 590:14-21.)

Reading the evidence in the light most favorable to the government, the jury could have chosen to believe Labno's version of the events over Delgado's. It could have determined that

Labno was a more credible witness than Delgado, that Labno had a better view of the events from where his car was parked, or that Labno was more familiar with Jefferson's appearance. The facts that Delgado did not see anyone run eastward on Arthington and Jefferson was not found until hours later (and not in Labno's car immediately following the robbery) corroborates this. Regardless, the court may not grant a judgment of acquittal based on its own assessment of witness credibility.

### B. Finding of facilitation

If the jury credited the government's version of the events, and particularly Labno's, then there was sufficient evidence to find that Jefferson met the facilitation element of aiding and abetting. By attempting to take the money from Parrish, Jefferson aided Parrish's carrying of the firearm "through division of labor and [ ] this amounts to facilitation." *Woods*, 148 F.3d at 848 (citing *United States* v. *Medina*, 32 F.3d 40, 47 (2d Cir. 1994)). Coupled with the evidence that Jefferson was integral to the planning of the robbery, that he unlocked the doors to the car, alerted Parrish to an opportune moment to rob Labno by way of the text message, and that he continued to participate by running alongside Parrish after learning that Parrish had a gun, this is enough to fulfill the facilitation element of the aiding and abetting offense.

Jefferson does not point the court to any cases that compel a different result. Jefferson relies on *United States* v. *Dinkane*, 17 F.3d 1192 (9th Cir. 1994), to argue that "a defendant who aids an escaping armed bank robber by driving a get-away car cannot be convicted of armed bank robbery if the evidence does not show that the defendant ever knew his accomplice used a gun to put in jeopardy the life of any person." (Dkt. 115 at 4.) In *Dinkane*, the defendant was the get-away driver in a bank robbery, during which he remained in the car and waited for his

accomplices. The government presented evidence that the defendant had helped plan the robbery and that the defendant knew his accomplices used weapons *after* the robbery was completed. The Ninth Circuit held that this evidence was insufficient to find the defendant guilty of armed bank robbery under an aiding and abetting theory. The defendant had no knowledge that his accomplices had weapons until the weapons were "no longer being used to assault or to put lives in jeopardy," so evidence did not establish his "knowing and intentional participation in an essential element of armed bank robbery." *Dinkane*, 17 F.3d at 1197-98.

*Dinkane* is distinguishable because unlike the defendant in *Dinkane*, Jefferson saw Parrish point his loaded gun at Labno but still facilitated Parrish's escape by running alongside him and attempting to take some of the money. He thus knew about the use of the weapon while it was still being used to "put lives in jeopardy" but nevertheless participated in the ongoing offense. *Id.* at 1197.

## CONCLUSION

Jefferson's motion for acquittal (dkt. 115) is denied. Sentencing shall proceed on April 25, 2014, as scheduled (*see* dkt. 131.)

Date: January 21, 2014

_____

U.S. District Judge Joan H. Lefkow

19